# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00018-COA

| | |
|---|---|
| SANDRA BAUR | APPELLANT/<br>CROSS-APPELLEE |

v.

| | |
|---|---|
| NANCY SHIRLEY BAGGETT RIBELIN | APPELLEE/<br>CROSS-APPELLANT |

| | |
|---|---|
| DATE OF JUDGMENT: | 10/28/2022 |
| TRIAL JUDGE: | HON. MICHAEL CHADWICK SMITH |
| COURT FROM WHICH APPEALED: | PERRY COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | ORVIS A. SHIYOU JR.<br>TISDALE CHRISTIAN SHIYOU |
| ATTORNEYS FOR APPELLEE: | SAMUEL STEVEN McHARD<br>PAUL MANION ANDERSON |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED.<br>ON CROSS-APPEAL: AFFIRMED -<br>10/22/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A woman claimed she owned 47 acres of land by adverse possession. But the chancery court denied her claim, finding that she could not establish all the elements. Specifically, the court determined that at the time her possession began, she knew she did not own the property and had set out intending to use adverse possession to take the property.

¶2.     In addition to defending against the claim of adverse possession, the rightful owner filed counterclaims for removal of cloud on the title, intentional and negligent infliction of emotional distress, slander of title, and the unlawful removal of survey markers. The

chancery court confirmed title in the rightful owner and granted the request for removal of any cloud on the title, but the court denied the other counterclaims.

¶3.    Both parties appeal. We find no error and affirm on all grounds.

## BACKGROUND FACTS

¶4.    The property at issue is located in Perry County and consists of a combination of three sections of mostly unimproved "wild" land. In 1960, Willis McGee conveyed the property to J.R. Shirley. In 1996, title to the property passed from J.R. Shirley to his daughter Nancy Ribelin and her brother. Nancy's brother later quitclaimed his ownership to her in 2004.

¶5.    At some point while title still belonged to Shirley, another family—Sandra Baur and her father—began living on an adjacent piece of land. Baur would later testify that beginning in 1989, she began treating the contested forty-seven acres of property as her own. She would say that she trimmed trees and grass, conducted "burns," raised cattle, replaced fencing and gates, removed squatters and trespassers, and installed "no trespassing" and "no dumping" signs.

¶6.    But in a series of letters spanning the 1980s to the early 2010s, Baur repeatedly recognized that title to the land was vested in either Nancy or her predecessor in title, Shirley. Nonetheless, she indicated her intent to pursue ownership via adverse possession.

¶7.    For instance, in 1989, Baur wrote a letter "notifying all area property owners of my intent to occupy, maintain and establish three parcels of land" and acknowledging that "Mr. Shirley own[s] this property[.]" A few years later, in 1998, Baur sent another letter after people built a residence on the property. She wrote, "[Y]ou have set up residence on property

2

you do not own," as "this property went thru probate . . . for Mr. Shirley, submitted by Nancy Shirley Ribelin, Executor, and the court awarded this property to her and her brother[.]" Baur also specifically stated, "I have claimed this property since 1989," and "my claim is current and will continue."

¶8.    In 2001, Baur sent a third letter, this time writing, "I have noticed you in the past of my claim to this property. . . . I will continue my claim until such time to legally file for title," and "I consider this my property[.]" The following year, in 2002, Baur sent another letter and asserted, "My claim of adverse possession has matured and I have met all the conditions to the best of my knowledge[.]"

¶9.    Then in 2010, Baur began to write letters to Nancy and Nancy's lawyer in an effort to purchase the property. There were at least three letters in which Baur acknowledged she was aware that Nancy owned the property.

¶10.    One letter from Baur dated August 2010 flatly asserted, "My position is Mrs. Ribelin, is now the only person with sole interest in this property." She continued, "I have asked Mrs. Ribelin to consider selling this property to me[.]"

¶11.    Another letter from Baur from September informed Nancy, "I am still interested in purchasing this property from you[.]" And in October, Baur reiterated, "I am sincere in wanting to purchase the 47 acres from you[.]"  Throughout these communications over the years, Nancy repeatedly refused to sell any of the property.

¶12.    Despite Nancy's numerous and clear refusals to sell, in 2015, Baur filed a quitclaim deed attempting to convey the property to herself. She testified she paid the property taxes

in 2015, 2016, 2017, 2018, 2019, and 2020.[1] But even after she filed the quitclaim deed, Baur continued trying to purchase the property from Nancy well into 2021.

**PROCEDURAL HISTORY**

¶13.    In September 2021, Baur filed a complaint against Nancy in the Perry County Chancery Court, asserting a claim of ownership by adverse possession and seeking to quiet title to the property. Nancy filed an answer and asserted counterclaims for removal of cloud on title, intentional and negligent infliction of emotional distress, slander of title, and the unlawful removal of survey markers.

¶14.    Nancy subsequently filed a motion in July 2022 requesting the chancellor to inspect the property at issue. "To that end, the Court personally inspected the Property to ascertain the extent and nature of the fencing and signage." Upon personal inspection, the chancellor observed, "One strand of barbed wire fencing" that "was not easily visible, appeared to be new as it was not weathered, and only ran for a few feet along the Property border." He also saw "a few old fence posts along some of the border without any fencing" and "a couple weathered 'no trespassing' signs that could have predated 2010." There were "newer signs installed along the border" that "were not weathered, the screws holding the signs in place were not weathered, and certainly did not predate 2010." In sum, the personal visit revealed "the entire 47-acres is not currently fenced."

¶15.    After two days of trial and the visit to physically see the property, the chancellor entered a final judgment. The chancellor found that Baur carried her burden of proving two

---

[1] Meanwhile, Nancy paid the property taxes in 2011, 2012, 2013, 2014, 2019, and 2021.

of the elements of adverse possession: exclusive and peaceful use (until 2010), but she did not prove by clear and convincing evidence that her possession was based on a claim of ownership; actual or hostile; open, notorious, and visible; or continuous and uninterrupted for a period of ten years.

¶16.    More specifically, the chancellor found the evidence "insufficient to prove that Baur 'flew her flag' on the property for any ten-year period from 1989-2010." "Baur cannot prove the claim of ownership element" because "[t]here was never a mistaken belief that she (Baur) was the owner of the Property," and "[i]t is clear Baur 'set out to adversely claim' Ribelin's Property." Baur's possession "was not actual or hostile, as a matter of law," since "she was never under a 'mistaken belief' that she was the record owner." Baur could not establish the open, notorious, and visible element by clear and convincing evidence "[d]ue to the lack of visible evidence – in the form of a lack of established, continuous fencing and a lack of weathered signage." Although she "has been actively involved in the property since 1989," Baur cannot prove the element of continuous and uninterrupted possession for a period of ten years because "there was no hostile or adverse claim to ownership at all, much less for the statutory ten year period."

¶17.    Consequently, the chancellor determined, "As Baur[] cannot meet all of the elements for adverse possession, her claim for adverse possession fails." The court's order concluded, "[T]he Court finds [Nancy] Ribelin to be the legal record owner of the Property" and consequently granted Nancy's claim to remove cloud on title.

¶18.    Next, the chancery court considered and ultimately denied Nancy's claim for slander

of title. The order stated Baur "believed that she had acquired the Property by adverse possession" and "[a]lthough Baur was mistaken, the Court finds no actual malice[.]" Thus, Nancy "did not carry her burden in proving that the filing" of the quitclaim deed in 2015 "was malicious or consisted of evil intent," which is required for a claim of slander of title.

¶19. The chancellor then addressed Nancy's claim for the unlawful removal of survey markers, denying the claim as a matter of law. The court's order stated, "A private party cannot bring a criminal claim against another," and "the Chancery Court cannot convict one of a crime, and therefore cannot assess a punishment or fine as set forth per statute."

¶20. Lastly, the chancellor ruled on Nancy's claim of intentional and negligent infliction of emotional distress. He found that Nancy and her husband each "testified about stress due to health issues and how Baur's communications . . . exacerbated that stress," but Nancy "did not state she was taking any medication for emotional distress, nor was there any medical testimony or documentation evidencing emotional distress." The chancellor's order concluded that Nancy "offered no evidence to support any findings of emotional distress to Ribelin proximately caused by Baur," and Nancy "did not carry her burden on this claim." Therefore, this claim was denied.

¶21. Baur appeals the denial of her claim for adverse possession, and Nancy cross-appeals the denials of her claims of slander of title, intentional and negligent infliction of emotional distress, and unlawful removal of survey markers, and requests attorney's fees and costs as well.

**STANDARD OF REVIEW**

6

¶22. This Court applies "a limited standard of review in examining and considering the decisions of a chancellor." *Franco v. Ferrill*, 342 So. 3d 1176, 1188 (¶28) (Miss. Ct. App. 2022) (quoting *Frazier v. Frazier*, 31 So. 3d 1218, 1219-20 (¶4) (Miss. Ct. App. 2009)). "The chancellor, as the trier of fact, evaluates the sufficiency of the proof based on the credibility of the witnesses and the weight of their testimony." *Revette v. Ferguson*, 271 So. 3d 702, 707 (¶9) (Miss. Ct. App. 2018) (quoting *Cook v. Robinson*, 924 So. 2d 592, 594 (¶9) (Miss. Ct. App. 2006)).

¶23. This Court "will accept a chancellor's findings of fact as long as the evidence in the record reasonably supports those findings." *Franco*, 342 So. 3d at 1188 (¶28). "The chancellor's determinations will only be reversed when they were manifestly wrong, clearly erroneous, or when the chancellor applie[d] an incorrect legal standard." *Powell v. Meyer*, 203 So. 3d 648, 652 (¶16) (Miss. Ct. App. 2016) (quoting *Pulliam v. Bowen*, 54 So. 3d 331, 334 (¶10) (Miss. Ct. App. 2011)).

## DISCUSSION

### I. Baur cannot prove a claim of ownership for adverse possession.

¶24. Baur argues the chancellor abused his discretion when addressing the adverse possession elements. She raises three issues in her quest to establish ownership. All three center around the chancery court's decision to review only the period of time between 1989 and 2010. Although Baur's appeal focuses on her belief that it was error for the chancellor to "limit the ten-year period in which he evaluated adverse possession," her claim does not actually hinge on the time period. Instead, the dispositive factor here is Baur's inability to

7

prove a claim of ownership.

¶25.   "[A] party may claim title to property after ten years' actual adverse possession." *Anderson v. Jackson*, 338 So. 3d 629, 641 (¶25) (Miss. Ct. App. 2022). Our courts "apply a six-part test for determining whether adverse possession has occurred[.]" *Powell*, 203 So. 3d at 652 (¶18). The party asserting title by adverse possession "must show that [her] possession was '(1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful.'" *Signaigo v. Grinstead*, No. 2022-CA-01212-COA, 2024 WL 2284923, at *3 (¶10) (Miss. Ct. App. May 21, 2024) (quoting *Frazier*, 31 So. 3d at 1220 (¶6)), *reh'g denied* (Miss. Ct. App. Oct. 22, 2024). Crucially, the burden of proof is on the party claiming adverse possession, and that party "must prove *each* element by clear and convincing evidence." *Id*. (emphasis added) (quoting *Franco*, 342 So. 3d at 1188 (¶29)).

¶26.   As our Supreme Court has declared, "the initial element to be proved by clear and convincing evidence is a claim of ownership." *Blackburn v. Wong*, 904 So. 2d 134, 137 (¶19) (Miss. 2004). "[T]he claim of ownership must have existed at the beginning of the statutory period of possession and not possession with the intent to claim as soon as the statutory period passed." *Id*. (quoting *Coleman v. French*, 233 So. 2d 796, 796-97 (Miss. 1970)). We have found, "No claim of ownership existed during any period after the [claimant] knew that the adjacent parcel belonged to" someone else. *Presley v. Stokes*, 290 So. 3d 763, 767 (¶13) (Miss. Ct. App. 2020).

¶27.   In *Wong*, the Supreme Court found that the person seeking the property "never had

8

a claim of ownership" because he had "set out in a deliberate attempt to adversely possess" it but actually "knew he did not own" the property. 904 So. 2d at 137 (¶¶20-22). Accordingly, the chancery court's decision to deny adverse possession was affirmed. *Id*. at (¶22).

¶28.    In a recent case, we applied *Wong* in examining this first element where a family "purchased lots" in a subdivision, but they "knew that the neighboring lots 36 and 37 belonged to someone else." *Signaigo*, No. 2022-CA-01212-COA, 2024 WL 2284923, at *3 (¶12). "Despite that knowledge, the Signaigos built a fence encompassing a portion of their property and all the subject property," and then they later "sent letters to [the rightful owner] hoping to make an offer to purchase the land but never made contact with her." *Id*.

¶29.    Crucially, the husband and wife "admitted in their depositions that when they purchased their property, they knew the subject property was not theirs." *Id*. at *4 (¶17). We reasoned that since "[t]he Signaigos had actual knowledge that the subject property was not theirs . . . no claim of ownership existed." *Id*. "Following *Wong*'s holding, our analysis ends." *Id*.

¶30.    Baur's case mirrors the actions of those seeking possession of land in *Wong* and *Signaigo.* The chancellor used 1989 as the starting date for its analysis because, by Baur's own claim, that is when she said she began taking possessory actions. The trial court had evidence of a series of letters Baur had written, which included the following:

- In 1989, Baur said she knew "Shirley owns this property";
- In 1998, Baur identified that Nancy probated Shirley's estate and "the court awarded this property to her and her brother";
- In August 2010, Baur stated Nancy "Ribelin, is now the only person with sole interest in this property";
- In September 2010, Baur wrote to Nancy acknowledging Nancy

9

as the owner and stating, "I asked if you would consider selling this property to me";

- In October 2010, Baur told Nancy "you are the sole owner"; and also separately identified "the sole owner of record to be Nancy" in a letter to the tax assessor; and

- In June 2011, Baur acknowledged that the property belonged to Nancy.

¶31.   Baur's voluminous communications sent to Nancy and other third parties over the decades repeatedly show she knew she did not own the property and was aware Nancy owned it. Because Baur recognized that the 47 acres belonged to Nancy and her heirs as early as 1989, Baur could not establish ownership in that year or any period afterward. *See Presley*, 290 So. 3d at 767 (¶13).[2]

¶32.   Furthermore, "Mississippi law states that 'one cannot set out to adversely possess the property of another[.]'" *Id.* (quoting *Wong*, 904 So. 2d at 137 (¶19)).

¶33.   The letters documenting Baur's communications with Nancy and other third parties also reveal:

- In 1989, Baur identifed her intent to establish the property as her own;
- In 1998, Baur stated she claimed the property since 1989 and intended to continue pursuing her claim;
- In 2001, Baur noted that she previously sent notice of her property claim and was continuing her claim with intent to file for title;
- In 2002, Baur stated, "My claim of adverse possession has matured and I have met all the conditions";
- In 2015, Baur executed an affidavit acknowledging her "claim of property thru adverse possession starting with outward notice . . . since

---

[2] Based on the evidence in the record, the first time Baur claimed ownership separately from someone else's ownership was in her affidavit that she attached to the 2015 quitclaim action. Even if we were to consider Baur's 2015 quitclaim deed as the beginning of her claim of ownership, her suit for adverse possession was filed only six years later in 2021. Therefore, just as in *Signaigo*, Baur "fail[s] to show [her] claim of ownership existed for the ten-year statutory requirement." *Signaigo*, 2024 WL 2284923, at *4 (¶17).

1989"; she "has consistently since 1989 (26 years) without fail, maintained & exercised all rights and privileges of a landowner and has more than met the statute requirements" for adverse possession; and she "claims ownership of this property since 1989";

- In 2016, Baur said she told a third party "in 1989 that I was pursuing adverse possession ownership of the 47 acres"; "for 20 years now I had maintained ownership of this property thru adverse possession"; and "my claim of ownership has been consistent from 1989"; and

- In 2017, Baur wrote, "I claim this property and have done so since January 1989. I have done all of the steps to claim ownership thru the years[.]"

Clearly, Baur's letters show she intended to use adverse possession to take ownership of the property. The evidence indicates that when Baur's possession of the property began back in 1989, she "set out in a deliberate attempt to adversely possess" the property. *Wong*, 904 So. 2d at 137 (¶20). This type of conduct is specifically prohibited.

¶34. Just like those attempting to claim adverse possession in *Wong* and *Signaigo*, Baur "cannot prove the claim of ownership element of adverse possession by clear and convincing evidence." *Signaigo*, 2024 WL 2284923, at *5 (¶21). We find that the chancellor did not abuse his discretion in denying Baur's claim for adverse possession.

## II.     Baur is not liable for the tort of slander of title.

¶35. Turning to Nancy's four-part cross-appeal, her first issue is that the trial court should have found Baur was liable for the malicious filing of a false deed when she recorded the 2015 quitclaim to herself.

¶36. "Words spoken of property are not in themselves actionable," our Supreme Court has held, "[b]ut the publication of false and malicious statements, disparaging of plaintiff's property or the title thereto, when followed, as a natural, reasonable and proximate result, by

11

special damage to the owner, are actionable." *Walley v. Hunt*, 212 Miss. 294, 305, 54 So. 2d 393, 396 (1951). "The false statement may consist of an assertion that plaintiff has no title to the property of which he is the ostensible owner, or that his title is defective, or that defendant has an interest in or lien upon the property." *Id*.

¶37. Not all statements trigger the application of the tort. "Whatever be the statement, however, in order for it to form the basis of a right of action it must have been made, not only falsely, but maliciously." *Id*. "Malice requires a showing of evil intent or ill will toward another, either through conduct or statements, without just cause or excuse." *Zebe LLC v. Robinson*, 296 So. 3d 211, 216 (¶12) (Miss. Ct. App. 2020) (internal quotation marks omitted). So "a party who commits an act under reasonable belief of title will not be said to have acted maliciously when committing the act." *Id*. at (¶13) (internal quotation marks omitted).

¶38. Here, the trial court found that "Baur's action in filing the quitclaim deed in 2015 was false and improper." But the court further made a finding of fact that "[a]s early as 1998 and again in 2002 in letters penned from Baur . . . she believed that she had acquired the Property by adverse possession" and, indeed, "reasserted this belief in 2016 in her response to Ribelin's attorney." The trial court found that while she "was mistaken," this error did not constitute "actual malice on Baur's part."

¶39. We addressed a similar circumstance in *Zebe*, which "involve[d] a property boundary disagreement between neighboring landowners" that devolved into "posting 'no trespassing' signs, using profane language and gestures, and filing criminal charges[.]" *Id*. at 213 (¶1).

12

We affirmed the trial court's finding of lack of malice by the neighbor since these actions "were taken with the erroneous belief that he owned the subject property in question." *Id*. at 216 (¶13).

¶40.     The proof in this case echoes *Zebe*. The record is replete with Baur's confident, if mistaken, belief that she owned the 47 acres. She testified that she "treated it like I was the landowner" and that she did "anything and everything that a true landowner would do." The thrust of her letters from 1989 to the 2010s was that she knew Nancy (or her predecessors) was the owner but that Baur was steadily acquiring the property through her actions. As set out above, that is not how adverse possession works in the State of Mississippi. But in the eyes of the chancellor, it was not enough to support a finding that Baur had malice.

¶41.     Because these findings were not manifestly wrong, we affirm.

### III.     Nancy did not provide evidence of intentional or negligent emotional distress.

¶42.     The second issue on cross-appeal is whether Nancy could have recovered for emotional distress she allegedly suffered from Baur's actions. In the trial court, she counterclaimed for both intentional and negligent infliction of emotional distress.

¶43.     Our decision above that Baur did not act with malice informs the first component of this point. "Mississippi's standard for a claim of intentional infliction of emotional distress is very high, focusing specifically on the defendant's conduct and not the plaintiff's emotional condition." *Goode v. Walmart Inc.*, 372 So. 3d 149, 163 (¶39) (Miss. Ct. App. 2023) (internal quotation marks omitted). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded

13

as atrocious, and utterly intolerable in a civilized community." *Id*. (internal quotation marks omitted).

¶44. The trial court found that Baur's specific conduct in attempting to quitclaim the property to herself in 2015 and other actions related to her mistaken belief that she had adversely possessed the property were not done with malice. *Goode* makes clear that "liability does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities" and, instead, must span into the outrageous. *Id*. at 163 (¶39). Furthermore, "a defendant's conduct must be wanton and wilful and such that it would evoke outrage or revulsion." *Holloway v. Nat'l Fire & Marine Ins. Co.*, 360 So. 3d 671, 676 (¶12) (Miss. Ct. App. 2023). We cannot say this conduct hits that high mark.

¶45. As to the second component, our law is clear that "[a] plaintiff may not recover for a claim of negligent infliction of emotional distress without showing that he or she suffered a physical injury." *Waters v. Allegue*, 980 So. 2d 314, 318 (¶13) (Miss. Ct. App. 2008). There was no such proof in this case. Over the two days of trial, there were only a few bare references to any distress at all. Some of the only proof came from Nancy's husband, who pointed out that after "Nancy saw her name being involved in a court case on the internet, that rattled her." Nancy herself simply said Baur's communication with her "was very distressing to me" and that she "felt bad because [Baur] seemed so . . . needy." But when pressed for details, she just said, "There is plenty of emotional distress."

¶46. The trial court found that Nancy "offered no evidence to support any findings of emotional distress," and we find no reversible error.

**IV.    Nancy cannot recover damages for the removal of survey markers.**

¶47.    For her third assignment of error, Nancy argues Baur should have been held liable for removing markers placed by a surveyor.

¶48.    State law forbids certain types of trespasses, including entry "upon the lands of another" to "intentionally injure, disfigure, remove, excavate, damage, take, dig into, or destroy any historical structure, monument, marker, medallion, or artifact, or any prehistoric or historic archaeological site, American Indian or aboriginal remains located in, on or under any private lands within the State of Mississippi." Miss. Code Ann. § 39-7-31 (Rev. 2014).

¶49.    Nancy claims that Baur admitted she took survey markers and that pursuant to this law, she should be able to sue her for damages as a result.  After some careful hedging in discovery, Baur ultimately agreed she did pull up some stakes placed by a surveyor but only recently placed ones. During trial, she said she had watched the surveyor place them.

¶50.    In any event, the trial court found that Nancy could not base a civil tort upon a law that carries a misdemeanor penalty and denied relief. *See* Miss. Code Ann. § 39-7-35 (Rev. 2014) ("Any person violating any of the provisions of this chapter shall be guilty of a misdemeanor").[3]

¶51.    We affirm but for other reasons.  This chapter of the Code is devoted to and titled "Antiquities," nested beneath Title 39, which is set aside for "Libraries, Arts, Archives and History."  The Legislature declared the purpose of this section: "It is hereby declared to be

---

[3] Our Supreme Court has recently reiterated that "tort duties are a question of law for the Court and generally are imposed as a matter of public policy." *City of Picayune v. Landry Lewis Germany Architects P.A.*, 381 So. 3d 1103, 1107 (¶15) (Miss. 2024) (cleaned up) ("declin[ing] to create a tort duty under the facts of today's case").

the public policy and in the public interest of the State of Mississippi to locate, protect, and preserve all sites, objects, buildings, shipwrecks, and locations of historical, archaeological, or architectural significance[.]" Miss. Code Ann. § 39-7-3 (Rev. 2014).

¶52. This policy includes but is not limited "to historically or architecturally significant buildings, structures relating to significant engineering accomplishments, prehistoric and historical American Indian or aboriginal campsites, dwellings, and habitation sites," and "archaeological sites of every character," as well as "treasure imbedded in the earth, sunken or abandoned ships and wrecks of the sea," among other things. The point is clear: the purpose is to protect the shared history of Mississippi.

¶53. And while not pointed out by the parties, we note that the Legislature expressly created a civil action to enforce the contents of the Antiquities chapter. "Any citizen in the State of Mississippi shall have the power to bring an action in any court of competent jurisdiction to enjoin violations or threatened violations of this chapter, and for the return of items taken in violation of the provisions hereof." Miss. Code Ann. § 39-7-37 (Rev. 2014).

¶54. We need not address at this juncture whether brand-new stakes placed for a recent survey fall within the protection of a chapter meant to safeguard antiquities. Under the express language of the chapter, at most, Nancy could have filed suit under this chapter to enjoin the removal of the survey markers or for their return, not for damages. Because she instead sought damages, and the statute does not authorize such, we affirm the trial court's denial of the counterclaim.

V.    **Any award of attorney's fees and costs was within the chancery court's discretion.**

16

¶55. On appeal, Nancy claims that because Baur's claims against her were "meritless," she should have been awarded costs and fees.

¶56. In support, she cites the Litigation Accountability Act, which in relevant part allows "reasonable attorney's fees and costs against any party or attorney if the court . . . finds that an attorney or party brought an action . . . that is without substantial justification[.]" Miss. Code Ann. § 11-55-5(1) (Rev. 2019).

¶57. In addition, "Mississippi Code Annotated section 11-55-7 lists the relevant factors for a court to consider in granting an award of attorney's fees[.]" *Herbert v. Herbert*, 374 So. 3d 562, 580 (¶54) (Miss. Ct. App. 2023). Such as, "Whether or not the action was prosecuted or defended, in whole or in part, in bad faith or for improper purpose," and, "The extent to which the party prevailed with respect to the amount of and number of claims or defenses in controversy[.]" *Id*. (quoting Miss. Code Ann. § 11-55-7(d) & (f) (Rev. 2019)).

¶58. "The decision to award monetary sanctions under the Litigation Accountability Act is left to the discretion of the trial court." *Id*. at 579 (¶50) (internal quotation marks omitted). Furthermore, the Mississippi Supreme Court has "empowered trial courts with the discretionary authority to sanction, including the authority to dismiss an action[.]" *Mize v. Shiloh Mkt. Inc*., 336 So. 3d 654, 658 (¶15) (Miss. Ct. App. 2022) (quoting *Ashmore v. Miss. Auth. on Educ. Television*, 148 So. 3d 977, 981 (¶10) (Miss. 2014)).

¶59. The trial court did not go into detail regarding its denial of costs and fees in this case, but much of our foregoing analysis has mirrored a key factual determination: Sandra Baur genuinely believed she had adversely possessed this property. This included filing a lawsuit

17

to have the property declared hers through adverse possession. While the trial court and this Court have concluded her good faith belief did not meet the clear and convincing standard of the proof required, for many years Baur acted as the owner of the 47 acres. There were certainly actions she took that were hard-edged, as the trial court acknowledged. Yet Nancy ultimately prevailed at trial, and Nancy also prevailed in having any cloud of title lifted.

¶60. Whether to award costs and fees is within the discretion of the trial court, and we see no abuse of that discretion here.

## VI. The requests for appellate attorney's fees are denied.

¶61. Both parties to this appeal have filed dueling motions requesting appellate attorney's fees. The grounds asserted by both parties are identical—each claiming that the other pursued a case without legal or factual support. Baur argues she has had "to respond to meritless arguments," and Nancy claims that "Baur's meritless litigation has caused Nancy to incur" significant fees on appeal.

¶62. "When a prevailing party requests attorneys' fees on appeal, 'typically, the Court awards attorney fees on appeal in an amount equal to half the amount awarded at trial.'" *Gibson v. Bell*, 312 So. 3d 318, 325 (¶30) (Miss. 2020) (quoting *Latham v. Latham*, 261 So. 3d 1110, 1115 (¶22) (Miss. 2019)). However, "such an award may not be fair and equitable in all cases[.]" *Id*. "Our Rules of Appellate Procedure require the party requesting attorney's fees 'to file a motion in the Court, supported by affidavits and time records that establish the actual fees expended on appeal.'" *Rogers v. NewSouth NeuroSpine LLC*, 382 So. 3d 1175, 1181 (¶18) (Miss. Ct. App. 2024) (quoting *Latham*, 261 So. 3d at 1115 (¶22)).

18

¶63. Baur filed her motion on February 19, 2024, claiming this appeal caused her "to incur significant attorney's fees and costs," but she did not include a specific monetary amount that she sought to be awarded. Her motion merely stated she "will file an affidavit verifying the attorney's fees and costs on the appeal as a supplement to this motion." But in the months since, Baur never supplemented her motion with any affidavits or documentation. As a result, her motion lacks supporting affidavits and information, such as time records that could establish the work performed and costs expended on appeal.

¶64. A deficiency of this type may result in a denial without prejudice to allow a properly filed motion. *Stewart v. Stewart*, 309 So. 3d 44, 103 (¶212) (Miss. Ct. App. 2020) (where we "den[ied] [a] motion for appellate attorney's fees without prejudice to [a party's] ability to refile his request prior to the issuance of the mandate in a motion that complies with Rule 27(a) and the requirements of *Latham*"); *Rogers*, 382 So. 3d at 1181 (¶18) (denying without prejudice request for appellate attorney's fees when it was not contained in a separate motion). This allowance would be fruitless in this appeal since Baur's assignments of error do not necessitate reversal. Accordingly, Baur's motion for appellate attorney's fees is not well taken and is denied.

¶65. In contrast, Nancy supported her motion for appellate attorney's fees with an affidavit by counsel and an itemized invoice of the work performed and fees incurred. According to the affidavit, Nancy incurred $8,653.00 in appellate attorney's fees and $390.01 in court costs, for a total of $9,043.01.

¶66. Simply prevailing on appeal does not entitle a party to the award of appellate

attorney's fees. *See generally Grisham v. Hinton*, 490 So. 2d 1201, 1205 (Miss. 1986). Instead, there are a limited number of situations that may warrant the imposition of appellate attorney's fees. A request for appellate attorney's fees may be based upon Mississippi Rule of Appellate Procedure 38, which provides that "[i]n a civil case if the Supreme Court or Court of Appeals shall determine that an appeal is frivolous, it shall award just damages and single or double costs to the appellee." *See* En Banc Order, *Gilmer v. McRae*, 2021-CA-00028-SCT (Miss. Feb. 9, 2023) (awarding appellate attorney's fees in the amount of $38,126.50 when underlying lawsuit was "frivolous" and appellant failed to respond to motion for fees and costs). Furthermore, we "may award appellate attorneys' fees that are authorized by a contract." *Bailey v. Chamblee*, 192 So. 3d 1078, 1083 (¶16) (Miss. Ct. App. 2016); *see* En Banc Order, *Wellsgate Homeowners Assoc. v. Hilton*, No. 2019-CA-00507-COA (Miss. Ct. App. Jun. 16, 2020) ("the appellant's 'Covenants, Conditions, and Restrictions' provided that those who violate them would be required to pay applicable attorney's fees and litigation costs"). Appellate attorney's fees may also be allowed when a party successfully defends a trial court's finding of a fraudulent conveyance. *See generally Myers v. Myers*, 741 So. 2d 274, 281 (¶31) (Miss. Ct. App. 1998) ("a trial court may award attorneys' fees, in divorce actions, where fraudulent conveyances are involved"); *see* En Banc Order, *Lofton v. Lofton*, No. 2021-CA-00035-COA (Miss. Ct. App. Apr. 25, 2023) (granting motion for $25,655 "for attorney's fees and costs related to this appeal" when Court of Appeals "affirmed [a] judgment setting aside certain fraudulent transfers of real and personal property"); En Banc Order, *Lofton*, No. 2021-CA-00035-COA (Miss. Ct. App. Aug.

2, 2023) (granting supplemental motion for costs and fees in competing rehearing and certiorari requests in the amount of $4,270).

¶67. An award of appellate attorney's fees may also be granted when a contempt award is affirmed on appeal. *Riley v. Riley*, 196 So. 3d 1159, 1164-66 (¶¶23-32) (Miss. Ct. App. 2016) (holding that an award of appellate attorney's fees is appropriate when the chancery court awarded fees based on a finding of contempt and the recipient must defend the finding on appeal). Relatedly, a prevailing party may seek appellate attorney's fees based upon a finding of unfounded "allegations of domestic violence" pursuant to Mississippi Code Annotated section 93-5-24(9)(c) (Rev. 2018). *Stewart*, 309 So. 3d at 102-03 (¶¶202-11); *see* En Banc Order, *Stewart*, No. 2018-CA-1542-COA (Miss. Ct. App. Jan. 21, 2021) (granting motion for $6,899.55, which constituted half of the trial court's award for successful defense of contempt action).

¶68. Although she properly followed current procedure in requesting appellate attorney's fees, Nancy has not provided any authority to support a grant of such award in a case of this type or procedural posture, nor was she successful in obtaining attorney's fees in the trial court. At its root, Nancy's argument is simply that Baur's appeal is frivolous. As we explained above, the chancellor was correct to determine that Baur's actions were not malicious or frivolous, but rather misguided. Our Supreme Court has determined that "an appeal is frivolous where the appellant has no hope of success," and given the complexity of this case, we do not find it reaches this high standard. *Flowers v. Boolos (In re Est. of Smith)*, 204 So. 3d 291, 316 (¶60) (Miss. 2016). Accordingly, Nancy's motion for appellate

21

attorney's fees is denied.

## CONCLUSION

¶69.    Baur cannot prove the claim-of-ownership element of adverse possession by clear and convincing evidence.  Therefore, we affirm the chancery court's order denying Baur's claim of title by adverse possession.

¶70.    As to Nancy's cross-appeal, we find that because Baur did not act with malice, her claim for slander of title was properly denied.  As there was no proof of emotional distress, whether intentional or negligent, the claim was likewise properly denied.  Because Nancy's claim for damages based upon the removal of survey markers exceeded the statutory authorization, it was also properly denied.  Last, it was within the trial court's discretion to deny the request for attorney's fees and costs, and this Court likewise denies the two motions for appellate attorney's fees.

¶71.    **ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.  WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.  WEDDLE, J., NOT PARTICIPATING.**